The next case for argument is Doe v. WebGroup Czech Republic at Ball. Mr. Shower, right? Yes, Your Honor. Thank you. Proceed. Thank you. Good morning. My name is Mark Shower, and I represent the plaintiff appellate in this case. Good morning, Mr. Schaffer. I'd like to reserve two minutes for a panel if I may. You may kick around the clock, please. Yes, sir. This appeal involves a dismissal for lack of personal jurisdiction of claims that the plaintiff, a Californian who was the victim of sex trafficking as a minor, brought against Czech owners and operators of two of the largest websites in the world, Xvideos and XNXX. The United States is by far the largest audience and market for those two websites. These defendants profited directly from plaintiff's sex trafficking by carrying videos and images of plaintiff's CSAM on their websites for several years. The focus of the district court's ruling below and on this appeal primarily relates to the express-aiming prong of the purposeful direction analysis under the due process requirements for personal jurisdiction. Let me ask you this, counsel. It says, I'm sure you know, Judge Gould, in his dissent in Walnut, suggested that this is not an exclusivity situation. I mean, the requirement that was referred to in the majority didn't exist. We then later had Will, who she was, of course, involved in, and he confirmed that. We also have Ayla. Yes. So would you tell me, from your perspective, what the law is now? Is Walnut an outlier? Is that the law? Where do we stand on that issue? I think that Walnut may be an outlier based on this court's decision to Ayla and the very recent decision to Wilko. That being said, I think that in some ways, when one looks at the standard for looking at the facts that can be relevant to express-aiming, the court is to look to the quality of all of the evidence that are presented to establish, and also to look at the totality, look at them in their aggregate, and see if all of the facts in a particular case satisfy express-aiming. And this, in Wilko, there was on the website, if you will, a privacy disclosure statement, and I'm reading this, this is a website available from its location in the United States. Is there anything like that in any of the websites that are owned by the defendants, to the best of your knowledge, and is shown on the record? Yes, there is, Your Honor. However, I don't want to overstate it. That may not have been expressly stated on the record, Your Honor. There are references to various type of legal disclosure pages in the First Amendment complaint. However, I do not believe the First Amendment complaint specifically cites a privacy page with that exact language that was discussed in Wilko. But from your perspective, looking at the totality of the record that's there, there is information that is similar, not the wording, but the concept, similar to what was found in Wilko, right? I don't know if there is, on the record, evidence of the same exact wording, Your Honor. And like I said, I just don't want to overstate that. No, I appreciate that. I'll ask your public panel. I believe there is simply different citations to the website itself, and incorporates the website generally. I do not believe there's a specific reference to a privacy page that says there are. That being said, I believe that there are, but not on the record. Okay. With regard to Wilko, which was decided just three months ago, this particular case has all of the same facts and evidence that the court, in Wilko, found to support express aiming over a foreign website operator, pornography operator in that case. First, this court placed a lot of emphasis on the use of servers within the United States or within North America. Specifically, the court in Wilko had a lengthy discussion of the technology of the Internet and how problems with slowness and what is called latency of loading is a big problem for Internet operators, and how the way you solve this is you put either the host server or what's called a content delivery network, a CDN, close to the people that you're interested in getting these things working. That one had one in Utah, right? It had a host server in Utah. It also had CDN contracts with people throughout North America. And the court in that case noted that both the host server in Utah and the CDNs throughout North America provided that, you know, optimal, you know, premium service throughout the United States. In this case, if I recall correctly, the district court essentially relied on, I say it when not or when, but however it is, finding it was essentially on all fours. Wilko didn't exist at the time. If you're the district judge, how do you reconcile those? Well, when WANOT was in existence, we first of all pointed out to the court. It's still in existence. No, no, I'm sorry. I apologize, Your Honor. Thank you for correcting me. WANOT, in WANOT, this court specifically said that if you use a technology company that provides faster services to the U.S. market, that can be evidence of express aiming. However, in WANOT, it went one step further and said there's no evidence in the WANOT case that the website operator intended, specifically chose to use the company that provided faster service in the United States to optimize service to U.S. users.  Unlike Wilko, where there was that evidence, and unlike our case. In our case, Robert Seifer, who's the chief administrative officer of the defendants, submitted a declaration in support of the motion to dismiss. And in that, he explained that they contract with CDNs around the world, but specifically that they contract with multiple CDNs in the United States. He also specifically testified that the reason that they contract with CDNs is because their specific intent is to provide the best possible speeds and service to users close by the CDN. Does the record show about whether or not they would get revenue per click? The evidence does not, the record does not show that they get advertising revenue per click on an ad. Does it show that they don't, or is it just silent? It is silent on that, your honor. However, what the record does show is that they receive revenue by having geotargeted ads placed on their websites. And there's an issue that the defendants use as a defense to the relevance of geotargeted advertising, that the advertising in this case is done by an entity called Traffic Factory. Now, Traffic Factory is co-defendant in this case. And Traffic Factory is a corporate affiliate of the other defendants. Also, Traffic Factory was not always in existence as a corporation. For quite a period of time, it was simply an in-house unit, where it was basically the ad department of the main defendants in this case. But is there anything in the record that shows that this affiliate advertising agency was directing, expressly aiming at more the United States vis-a-vis the rest? I don't know if the ownership really matters that much if the evidence, if the record doesn't show that it was really expressly aiming at the U.S. Well, they were placing geotargeted advertisements. And my understanding is that geotargeted, you know, our reasoning in the past is that, well, it targets everyone. So it really doesn't matter that some of it, you know, goes to the United States. So does the ownership really matter that much at all? Well, we've always contended from the district court on that ownership is not as highly relevant as the defendants seem to make out. The defendants like to put up the fact that there's this independent ad broker that differentiates what they do from whether the web operator themselves specifically chose to do the geotargeted advertising. However, what I would mention about Your Honor's comment about what this court has said in the past about the effect of geotargeted advertising going wherever a user may be located, that was the discussion in Wenat. However, in Wilco, the ad structure in Wilco, based on the opinion of this court three months ago, appears to be identical to the ad structure in Wenat. Do you want to save any time? It's up to you entirely, of course. Yeah, I'd like to save a couple minutes if I could. You don't have two minutes, but you can save what you've got. What? You don't have two minutes, but you can save what you've got left, which is 20 seconds. We might give you some more. Okay. I'll come back if I may, Your Honor. Okay. Thank you. All right. Mr. Schaffer, welcome from Washington, it looks like. Thank you, Judge. Well, we're here for our annual partnership meeting in Pasadena, so I was actually in Norfolk more or less to stroll over. Thank you, Judge Smith. May it please the Court. Your Honors, we're here on an appeal on specific jurisdiction. That is the plaintiff's theory, and Mr. Schaller, in making the arguments he does, we respectfully submit, is arguing against territorial and constitutional limits established by the U.S. Supreme Court and by this Court in Wenat, which I know Your Honors read and were talking to my friend about. In this case, Your Honor, there is no more express aiming than there was in Wenat, and that was found deficient. What about in Will Company, where the use of the CDNs to improve the service in a particular area and contracting with CDN services in the United States is going to facilitate the use of the service in the United States? So why isn't that targeting as it was in Will? Let me answer the substance first and then make a procedural point. Substantively, Judge Collins, it was emphasized, I think, by this Court in Willco, to distinguish from Wenat that, as you pointed out, Judge Smith, there was a U.S. server in Utah held by the defendant, and as to the CDN providers, they were specifically focusing on the United States, on North America, to the detriment of other countries. This Court emphasized in the key portion of its opinion that there was express aiming here because other parts of the planet were being disadvantaged with slower service. It has to be comparative. I mean, if you have a CDN service to improve the experience in the United States, that's targeting the United States, whether you have CDN services in other countries, isn't it? I don't think so. And I think otherwise, to me, it's a comparative and it has to be relative differential. I think that's right. I think that aiming at the planet... You can't target it at everywhere. That's right. At least as a rule. I think that's the rule from Wenat. I think that's consistent with what the U.S. Supreme Court has held and the territorial limitations in play here. But I don't think that a U.S. provider should be subject to jurisdiction all around the world simply because the way that you do it these days is to have CDN providers all around the world. What's in the record about where all the CDNs are? I think in the briefs I saw a lot of times worldwide. I mean, that could be Mexico, the United States, and Canada. I know they're worldwide. But where is it? Are there more CDNs in the United States vis-a-vis the rest of the world? Judge Lee, the record doesn't speak to that. And the plaintiff's allegations don't speak to that. And our invitations for jurisdictional discovery were refused. Would you say that there is a potential expressly aiming if 80% of the CDNs were based in the United States? If there could be that theory that, yes, you're favoring the United States or North America, let's say, to the detriment of the rest of the world, they would have that argument. I still think the absence of a U.S. server should be dispositive. I think that that's key when we talk about territory. But one other point specifically about CDNs and the trademark registrations and the U.S. contracts is that that argument was not made to the district court as part of the express aiming portion of the opposition. When the plaintiff sought reconsideration on this, the district court denied it, explaining that there was no basis for reconsideration. This is at 1ER, pages 4 and 5. And there's been no appeal by the plaintiff, no argument on appeal, that the district court's finding of waiver was wrong or that the denial of reconsideration was wrong. All you have is a footnote, footnote 10 on page 10 of the reply brief. That's not sufficient in our respectful submission to get these arguments even before the court. But, again, on substance generally, I think the fact that there's no theory here and no factual basis for a theory that there's aiming at the U.S. as compared to the rest of the planet should be dispositive because why not is this court's law. Wilco distinguishes it on two key grounds, and we agree with my friends on this, that the two key distinctions that this court focused on, on the closer question of express aiming there, were used specifically appealing to the United States market. Number one is what we were talking about, the presence of servers, which were in the United States as compared to elsewhere. And the second is that there was content that was tailored to the United States that provided assurance about compliance solely with U.S. law, no other law, and encouraged users and said that they would be safe under U.S. laws, different laws. Why isn't contracting with a CDN to cover the United States and make the experience in the United States, you know, better and faster? Why isn't that equivalent, why isn't it sort of the digital equivalent to contracting with the fulfillment center in the United States in ALA? So in ALA, Judge Collins, number one, it was a fulfillment center physically in the United States for delivery here. I think when we talk about the internet and the virtual space, it's something really quite different from that. And there's, I think, real changes. Is there not a CDN in the United States? There is, but it's not for physical delivery of our product. Your product isn't physical. So that's why I said it's kind of the digital equivalent. ALA has contracted with a fulfillment center to speed up the orders to get their goods. You contract with the digital equivalent in the United States to speed up the orders to customers in the U.S. And I just think it's especially slippery and dangerous in the internet context because anyone who's a global internet provider is going to do things like that. It's going to have geo-targeting for an audience. That's true for U.S. companies that could be subjected to jurisdiction in Germany and in Turkey and this sort of theory with them saying, look, your internet's here. You have CDN providers that are nearby. I don't think that would be fair treatment of a U.S. company. And I do think that that threatens to destroy careful limits on specific personal jurisdiction that should still be respected in this context, as they were and will not by this court. One other point, if I may, about ALA specifically. The other thing that was critical, I think, to this court in ALA is that there was, again, content that was specifically targeted to the U.S. audience, calling out the U.S. audience, quote, unquote, U.S. natives, coming from the defendant, which I think was important to this court's analysis. What about the advertising? Is the advertising arrangement here revenue per click? Is it affected by revenue per click? The record is silent on that, Judge Collins. Again, jurisdiction is. So now that Will has said that that's an important consideration, why shouldn't we remand and find out the answer to that question, which may make a big difference? It's not the defendant who's doing the advertising. I think that the geotargeting was not dispositive in WANOP, even in 42 Ventures, which followed WANOP, and remanded for the possibility that personal jurisdiction could be satisfied. It came down to, was there a U.S. server? That was the question that the district court was answering. And so I think to get to a contractor and how, you know, third-party advertising works, I think it's extending the analysis beyond what WANOP talks about. Does Will say that it's relevant, the revenue per click advertising arrangement? It's one aspect of it as to profiting, but I don't think it says that that's true as to what it calls the closer question as to appealing. But I also want to note, Your Honors, there are two alternative grounds for affirming it. If you think that the express-aiming question is close, we are talking about specific personal jurisdiction, which requires requisite connection between the plaintiff's contacts with the forum, the alleged contacts with the forum, and the theory. And here we've got a considerable room. What are we talking about, Judge Collins? CDN servers. Advertising, none of that has anything to do with the CSAM. Isn't the allegation that it was uploaded in the United States? It's not, Judge Collins. And I would encourage you to read what is cited in the brief of the plaintiff. I think it's on page 3. Those citations say nothing about the uploading or the downloading having happened in the United States, let alone explains how that connects to CDN servers or to advertising. Think how different this case might be on this question of nexus. If the plaintiff was alleging you were spamming U.S. users, if they were saying you were making faster calls because you have this special technology, or there were contracts that were violated with the CDN provider, that's essentially what you had in Wilco. That's actually what you had in Wenat. There were representations made about trademark registrations, about compliance with U.S. copyright law, and then claims that were copyright, that were trademarked. Here we are far removed from that. And I think when you read the Supreme Court's instruction in Bristol-Myers, in Ford, you would not be able to find requisite connection. That's footnote 9 of Wenat, where this court said that personal jurisdiction would be lacking for that additional reason. And the third reason here, Your Honors, if you needed to reach it, is for all the reasons we're talking about, it would be unreasonable to exercise jurisdiction over check companies. That's what I want to talk to you about here, the due process aspect of it. This whole thing is a brave new world, of course. If we were talking 100 years ago, it would be very, very different. We wouldn't have any of this. But we have a time of Zoom, there are translators. In terms of participating in a U.S. litigation, it's not that big a deal for your clients in Czechoslovakia or wherever to participate. In that sense, I'm not talking about the Supreme Court's, whether we have jurisdiction, but the participation, the due process aspect, hasn't that changed in the world that we now live in? I think we still have the requirement, Judge Smith. I think it still has meaning. I think it's especially important in the Internet context, especially so that we have reciprocal treatment for U.S. companies that are providing content around the world and can be subjected to seat there. But again, just to be sure, if you have a CEO in Prague, it's not hard for the CEO to get on a deposition through Zoom and hardly be inconvenienced at all, right? Yes, although here we have a suit against nine different Czech companies, and I know I'm out of time, Judge Smith. I'm asking the questions, okay. Okay, thank you. Here's what I would point to. The loan request in the record that came from the United States for the content to be taken down was complied with. That, I think, adds to the unreasonableness of exercising the jurisdiction. You have European regulators that have privacy, that have tight regulations. You have inconsistency, potentially, because they do have their own tight regulations, including on privacy. You have a conceded language barrier as to all of these high-level officers who'd be part of the case. They're not translators anywhere, right? Well, I've seen them. We've all seen those cases, Judge Smith. They can be tough on everyone, including for the witnesses. And you have a punitive class action, a punitive class action. So everyone who could state this allegation would be coming after my clients, and they'd have to answer to all of that without distinction, potentially, in the United States. And all of that is conceded because it's spelled out in the CIFRA declaration, and there's no factual refutation as to the unreasonableness of it. I think that makes that an alternative. I don't have any additional questions. I may not. Thank you very much. So your colleague has some time. He only had 20 seconds, so we're going to really loosen up and give you a whole two minutes. Thank you, Your Honor. I appreciate that. What's your response to his assertion that you did not plead that it was uploaded in the United States and that you don't have a record there for that additional problem? First off, I believe that there are clear – I don't know if the precise wording was whether it was or was not uploaded. It is very clear that the videos and the sex trafficking occurred in the United States, specifically in California, and that the sex trafficker – They're not alleged to be involved in that conduct. The conduct they carried would be that they carried it, and so that raises a question. Correct, Your Honor. It was uploaded in the U.S. I understand that, Your Honor. I would point out, first of all, that the district court decided this motion without an evidentiary hearing. So to the extent that there's any inferences to be drawn or any reasonable inferences should be drawn in favor of the plaintiff, I believe that there is enough in the First Amendment complaint to support that this CSAM came from the United States and it found itself on the defendant's websites. So it got there from one of two ways. Either someone put it on the websites or these websites went out and got it. However, the way they operate their business is primarily by people uploading the CSAM. But the CSAM itself, it is very, very clear, was created in California, and that's abundantly clear in the record. Also, with regard to any arguments about forfeiture or waiver of points like the CDNs and other things, I'd make a couple points. One, first off, in the record at 2ER180, which was the plaintiff's original opposition to the motion to dismiss in the lower court, there's a specific reference to the six facts that support personal jurisdiction in this case. They're the same facts that we point out on this appeal, and one of those specifically stated at 2ER180 is the CDNs in the United States. Also, this court has a precedent that says that when an issue like personal jurisdiction was resolved by the district court on appeal, a plaintiff can use other case law, can use other arguments to strengthen their argument, as long as the record of the evidence was in the record below, which it was here. If you ask my colleagues, your time is up, so I'm going to ask my colleagues whether they have additional questions. We thank you, gentlemen, and we don't have much more that you could say. Very interesting case. This is the kind of a case that law students would love. So maybe they'll get a chance to read about it. Who knows? But thank you both for your arguments.  The case just argued is submitted. Thank you, Your Honor.
judges: SMITH, COLLINS, LEE